1   Hugh R. Whiting (admitted *pro hac vice*)
    hrwhiting@JonesDay.com
2   JONES DAY
    901 Lakeside Ave.
3   Cleveland, Ohio 44114
    Telephone: (216) 586-1023
4   Facsimile: (216) 579-0212

5   Peter J. Biersteker (admitted *pro hac vice*)
    pbiersteker@JonesDay.com
6   JONES DAY
    51 Louisiana Avenue, N.W.
7   Washington, D.C.  20001-2113
    Telephone:  (202) 879-3939
8   Facsimile:   (202) 626-1700

9   Erik K. Swanholt (State Bar No. 198042)
    ekswanholt@JonesDay.com
10  JONES DAY
    555 South Flower Street
11  Fiftieth Floor
    Los Angeles, CA  90071.2300
12  Telephone: (213) 489-3939
    Facsimile: (213) 243-2539

13

14  Attorneys for Defendants
    MATTEL, INC. and FISHER-PRICE, INC.

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17                   WESTERN DIVISION

| | |
|---|---|
| 18  BRANDON BUTLER, individually and on behalf of all others similarly situated, | Case No. 13-00306 DSF (SSx)<br>Case No. 13-01700 DSF (SSx) |
| 19 | |
| 20 | (Consolidated) |
|     v. | And related consolidated cases |
| 21 | |
| 22  MATTEL, INC., a Delaware corporation, FISHER-PRICE, INC., a Delaware corporation, and Does 1–10. | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF PLAINTIFFS' EXPERT CHIN S. YANG** |
| 23 | |
| 24 | **Date:** March 31, 2014 |
| 25 | **Time:** 1:30 p.m.<br>**Courtroom:** 840 |
| 26 | |
| 27 | Assigned to The Honorable Dale S. Fischer for all purposes |
| 28 | |

**PLEASE TAKE NOTICE** that on March 31, 2014 at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 840 located at 255 East Temple Street, Los Angeles, California, 90012-3332, Defendants Mattel, Inc. and Fisher-Price, Inc. will, and hereby do, move under Federal Rule of Evidence 702 to strike the declaration of Plaintiffs' putative expert Chin S. Yang filed in support of Plaintiffs' Motion for Class Certification.

This Motion is made following the telephonic conference of counsel under Central District L.R. 7-3, which Defendants initiated on February 3, and took place on February 10, 2014 due to Plaintiffs' counsel scheduling conflicts. (Declaration of Erik Swanholt ("Swanholt Decl.") at ¶ 2). During that telephonic conference, Plaintiffs' counsel indicated that they would oppose the motion. (*Id.*). They further requested that Defendants delay filing the motion so as to allow Plaintiffs to file their opposition after the February 24 hearing on their motion for class certification, to which Defendants have agreed. (*Id.*)

This Motion is based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; all pleadings on file in this action, including all pleadings filed in support or and opposition to class certification; and such matters, evidence, and arguments presented to the Court before or at the hearing on this Motion.

**STATEMENT OF RELIEF SOUGHT**

Defendants seek an order excluding the expert declaration and testimony of Plaintiffs' putative expert witness Chin S. Yang on the grounds that:

(1)     Dr. Yang concededly lacks the specialized knowledge, skill, experience, training, education, and expertise to offer expert testimony regarding product design, medical causation, industrial hygiene, and risk assessment;

(2)     Dr. Yang has failed to point to objective external evidence validating his method, and his method is unreliable in any event;

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1    (3)    The analytical gap between Dr. Yang's limited data and his sweeping

2  opinions is too great to permit him to testify; and

3    (4)    Dr. Yang's opinion does not fit any issue presented in this case.

4  Dated:  February 18, 2014              JONES DAY

5

6                                                 By:_____/S/_____
                                                        Hugh R. Whiting

7                                                 Attorneys for Defendants
8                                                 MATTEL, INC. AND FISHER-
                                                 PRICE, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ....................................................................................... 3

III.  LEGAL STANDARD ............................................................................. 10

IV.   ARGUMENT ......................................................................................... 12

    A.    By His Own Admission, Dr. Yang Lacks The Requisite
        Expertise To Offer His Opinions ........................................... 12

    B.    Dr. Yang Did Not Apply A Reliable Scientific Method And
        Cannot Close The Analytical Gap Between His Data And His
        Opinion ................................................................................... 13

        1.    Dr. Yang Has Pointed To No Objective, Verifiable
            Evidence That He Applied A Reliable Method ....................... 13

        2.    Dr. Yang Admitted That He Did Not Develop A
            Hypothesis And That There Are No Standards To Support
            His Subjective Opinions .......................................................... 14

        3.    Dr. Yang Cannot Close The Analytical Gap Between His
            Data And His Opinion .............................................................. 16

    C.    Dr. Yang's Subjective Opinions Do Not Fit Plaintiffs' Motion
        For Class Certification Or This Case ...................................... 19

V.    CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ................................................................. 3

*Cholakyan v. Mercedes-Benz USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ..................................................... 2, 10

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ....................................................................... 2, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*") ...............................passim

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ..........................................................................passim

*Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ..................................................... 14, 17, 19

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................... 2, 10

*Estate of Barabin v. AstenJohnson, Inc.*,
  No. 10-36142, 2014 U.S. App. LEXIS 774 (9th Cir. Jan. 15, 2014) .......... 11, 15

*Gable v. Nat'l Broad. Co.*,
  727 F. Supp. 2d 815 (C.D. Cal. 2010) ....................................... 11, 12, 13

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ...................................................................... 15, 16, 17

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................ 11

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012), *petition for permission to appeal denied*
  (No. 13-80000, 9th Cir. Apr. 1, 2013), *petition for cert. filed and pending*
  (No. 13-138, U.S. July 30, 2013). ........................................................ 3

*United States v. Chang*,
  207 F.3d 1169 (9th Cir. 2000) ..................................................... 11, 12, 13

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ...................................................................... 3, 2

RULES

Federal Rule of Evidence 23 ....................................................................... 2

Federal Rule of Evidence 702 ............................................... 2, 10, 11, 16

DEFENDANT FP'S OPPN. TO MOTION
FOR CLASS CERTIFICATION

1  **I.**    **INTRODUCTION**

2         Plaintiffs' Consolidated Complaint "expressly exclude[s] . . . [a]ny claims for

3  personal injury . . . from this action." (Consol. Compl. ¶ 92 (Docket No. 36.1)).

4  The named Plaintiffs have all testified that neither they nor their infants

5  experienced any health consequences from use of the Fisher-Price Newborn Rock

6  'N Play Sleeper at issue in this case.[1]  In fact, no evidence exists that any infant or

7  other person has ever become ill from mold on a Sleeper.

8         Plaintiffs nonetheless bring this putative nationwide class action on the

9  allegation that the Sleeper is "defective" because it purportedly has a "propensity to

10  grow mold, which has been linked to serious health issues in infants." (*Id.* ¶¶ 5,

11  66.)  Plaintiffs view this linchpin allegation as "predominant," and seek to prove it

12  on a classwide basis through the testimony of their putative expert Chin S. Yang, a

13  microbiologist with a specialty in mycology. (*See* Pls.' Class Cert. Memo. at 13

14  (Docket No. 52-1) ("Pls.' Memo.").)  Dr. Yang opines in a declaration appended to

15  Plaintiffs' Motion For Class Certification that, due to its "design," the Sleeper has

16  "a high propensity to develop fungal/mold growth" and "poses a significant risk" of

17  health effects to infants who use the Sleeper, as well as to their parents and siblings.

18  (Ex. A[2] [Yang Decl.] ¶¶ 43, 45–46, 55 (Docket No. 52-71).)  Dr. Yang also opines

19  that the CPSC-approved cleaning instructions issued with the Recall to Inspect the

20  Sleeper "are inadequate to prevent mold, or to remove mold." (*Id.* ¶ 52.)

21         Plaintiffs cannot meet their burden to establish that Dr. Yang's standardless,

22  subjective opinions are admissible at the class certification stage or beyond. *First*,

23  Dr. Yang is not qualified to offer these opinions because—as he *conceded* at his

24  deposition—he is "not an engineer," lacks expertise to testify regarding the

25  "design" of the Sleeper, and is not an expert in "medical causation," "industrial

26  _____

         [1] In this Motion, the Newborn Rock 'N Play Sleeper will be referred to as "the
27  Sleeper"; Defendant Fisher-Price, Inc. as "FP"; and the Consumer Product Safety
   Commission as "the CPSC."

         [2] Unless otherwise specified, all references to "Ex. __" are to exhibits attached to
28  the Declaration of Erik Swanholt in support of this Motion.

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

hygiene," or "risk assessment."  (Ex. B [Yang Dep.] at 51:1–55:5, 243:16–247:23.)  *Second*, even if his conceded lack of expertise were not enough to exclude his testimony, Dr. Yang's opinion rests on an unreliable method.  Indeed, Dr. Yang freely admits that he did not even "think about" formulating a hypothesis or conducting an independent test of the Sleeper, and that his opinions are "subjective" and *not* the result of scientific methods or standards recognized in his field.  (*Id.* at 101:3–103:3; *see also id.* at 80:2-12, 94:15-24, 217:4-24.)  *Third*, Dr. Yang cannot bridge the wide analytical gap between his sweeping opinion and his limited data, which he assembled from a self-created "water test" that did not grow any mold, his inspection of three Sleepers selected by Plaintiffs' counsel, unverified consumer reports, studies conducted under unknown conditions, and medical case studies involving species of mold *never* found on any Sleeper.  *Finally*, given these shortcomings in Dr. Yang's qualifications, methodology, and data, his testimony unsurprisingly does not fit any issue presented in Plaintiffs' Motion for Class Certification or this case.

Because Dr. Yang's opinions are inadmissible, they cannot provide "common proof" of product defect, as Plaintiffs contend.  (*See* Pls.' Memo. at 13.)  *See also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (a plaintiff must "affirmatively demonstrate" compliance with Rule 23, including the commonality and predominance requirements).  The Court should perform its gatekeeping function under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals* and strike Dr. Yang's declaration filed in support of Plaintiffs' Motion for Class Certification.  *See, e.g., Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (the district court correctly applied the *Daubert* standard to motions to strike putative experts at class certification stage); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 541 (C.D. Cal. 2012) ("After *Dukes*,

1  the Ninth Circuit approved the application of *Daubert* to expert testimony presented
2  in support of or opposition to a motion for class certification.").[3]

3  ## II.   BACKGROUND

4       Dr. Yang readily admitted at his deposition that he is "not an engineer" and is
5  not qualified to testify regarding the "design" of the Sleeper or any other product.
6  (Ex. B [Yang Dep.] at 54:7–55:4.)  Dr. Yang also acknowledged that he is not a
7  medical doctor and has no expertise in "medical causation" or "industrial hygiene."
8  (*Id.* at 51:1–53:8.)  In his own words, Dr. Yang is "not a risk assessor" and has not
9  studied infant immunology.  (*Id.* at 243:16-17, 247:13-14.)  And Dr. Yang
10 disclosed that at least one court has refused to admit his testimony on even the
11 "general health effect" of mold.  (*See id.* at 40:25-41:11, 51:5-16.)

12      Dr. Yang spent only "roughly 12" hours preparing his opinion for this case.
13 (*Id.* at 69:24-70:2.)  While there are "around 1 million species" of mold, Dr. Yang
14 does not "know the particular species of mold that grew" on any Sleeper.  (*See id.*
15 at 171:15-172:21, 185:20-24.)  He did not even "think about" formulating "a
16 hypothesis" or designing an experiment to test Plaintiffs' allegations regarding the
17 Sleeper.  (*Id.* at 101:9–103:3.)

18      Dr. Yang conducted no testing or analysis "of the propensity for mold to
19 grow" on the Sleeper, let alone under conditions of "actual use."  (*Id.* at 67:17-21.)
20 In fact, Dr. Yang conceded that "high propensity to develop mold" is "not a
21 technical term" of recognized meaning in the field of mycology and, thus, that there
22 are no "standardized testing conditions" for it.  (*Id.* at 80:2-8, 94:15-22.)  Dr. Yang

---

23
24      [3] *See also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011)
(expressing "doubt" about the district court's conclusion "that *Daubert* did not apply to
25 expert testimony at the certification stage of class-action proceedings"); *Am. Honda Motor
Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam) (holding that "when an
26 expert's report or testimony is critical to class certification[,] a district court must
conclusively rule on any challenge to the expert's qualifications or submissions prior to
27 ruling on a class certification motion").  *But see Tait v. BSH Home Appliances Corp.*, 289
F.R.D. 466, 489–95 (C.D. Cal. 2012) (applying "tailored" *Daubert* standard at class
28 certification stage), *petition for permission to appeal denied* (No. 13-80000, 9th Cir. Apr.
1, 2013), *petition for cert. filed and pending* (No. 13-138, U.S. July 30, 2013).

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

further was unable to articulate any distinction between a "high, medium, and low" propensity to develop mold other than his own "belief." (*Id.* at 80:20–81:10.) And even using his own personal beliefs, Dr. Yang testified that whether a product has a "high propensity" to develop mold "depend[s]," at least to "a certain degree," on the proportion of products sold that reportedly develop mold, which he had not examined for the Sleeper. (*See id.* at 81:10–82:22.) Dr. Yang therefore admitted that his opinion that the Sleeper has a "high propensity" to develop mold is "subjective." (*Id.* at 101:3-6.)

Dr. Yang also did not attempt to articulate an objective external standard for measuring a "significant risk" of mold-related health effects to infants, parents, and siblings. (*See id.* at 217:4-24.) Dr. Yang does not "know if anybody" is ever "going to get" any disease from mold on a Sleeper. (*Id.*) Dr. Yang did not "undertake any risk assessment" or "have a study" to support his opinion that "parents and siblings may also be at risk" from the Sleeper. (*Id.* at 244:7-10.) Rather, Dr. Yang viewed the purported risk of health effects as "significant" because certain species of mold have contributed to a few immunocompromised individuals contracting diseases that he "would not want anybody to have." (*Id.* at 217:4-20.)

Dr. Yang did not perform any "study" or "assessment," or collect "any observational or experimental data," to demonstrate that following the CPSC-approved cleaning instructions in the Recall to Inspect "would fail to prevent" or "remove" mold from a Sleeper. (*Id.* at 257:17–259:12.) He also did not know whether any consumer who followed those cleaning instructions "got mold on their [S]leeper." *Id.* at 257:7-15. And he agreed that, due to the ubiquity of mold, it is a "Sysiphean task" to remove all mold from a product. (*See id.* at 253:23–254:2.)

Dr. Yang thus rested his "subjective" opinions regarding the Sleeper, and the "inadequa[cy]" of the CPSC-approved cleaning instructions, on seven pieces of

data which independently and collectively fail to support those opinions.  (*Id.* at 101:3-6, 256:21.)

**1.    Dr. Yang's Self-Created, Standardless "Water Test"**: Dr. Yang assembled a Sleeper and performed a "water test" of his own invention on it.  (*Id.* at 68:7-19.)  According to Dr. Yang, the water test did not "simulate . . . actual use" of the Sleeper or attempt to grow mold on it.  (*Id.* at 133:1-3.)  Instead, in Dr. Yang's view, because mold spores "are ubiquitous," all that is required for mold to grow is "water," and he devised the water test to determine whether the Sleeper would retain water where mold could grow.  (*Id.* at 90:2-6, 130:20–133:18.)  In Dr. Yang's words, the purpose of the "water test" was to facilitate his "qualitative observation" of "how much water" the "plastic shell scoop" of the Sleeper could hold and "where the water would go between the two fabrics and the shell."  (*Id.* at 64:4-10, 129:3-4.)

The "water test" consisted of two parts: pouring water into the "plastic shell scoop" of the Sleeper, and pouring "a few drops" of water onto the two layers of fabric encasing the plastic shell.  (*Id.* at 64:4-10.)  Dr. Yang did not measure the volume of the "few drops" of water he applied to the layers of fabric.  (*Id.* at 131:6–132:20.)  Moreover, even though he knew that "how quickly [the Sleepers] dry is going to be subject[] to the ambient humidity," Dr. Yang "did not measure the rate of humidity" in the room where he conducted the water test.  (*Id.* at 131:19-132:4.)

Dr. Yang inspected the Sleeper an indeterminate "few hours" after pouring the unspecified volume of water onto the fabric.  (*Id.* at 130:23–132:20.)  Dr. Yang concluded that the "finely woven polyester fabric of the top layer" of the Sleeper "tightly clings to the plastic shell when wet."  (Ex. A [Yang Decl.] ¶ 19.)  "This does not allow water to evaporate quickly."  (*Id.*)  As a result, Dr. Yang opined, the "design" of the Sleeper "traps moisture, leading to the growth of mold."  (*Id.*)

Dr. Yang admitted that there is no standard to measure whether a fabric is "finely woven," whether fabric "tightly clings" to plastic, or whether moisture

1   "evaporates quickly." (Ex. B [Yang Dep.] at 125:3–128:9.) Dr. Yang used these

2   terms according to "ordinary English usage," or "at least how [he] use[s] it." (*Id.* at

3   126:19-23.) He made these "qualitative type" of conclusions based on his

4   "observation" and using his "finger" to feel and "lift up" the fabric. (*Id.* at 128:8-

5   21.) Dr. Yang further acknowledged that there is "a way you can quantify" or

6   "measure[]" whether a product "traps moisture," but that he "did not" use it in his

7   water test. (*Id.* at 136:6-13.)

8       Dr. Yang declined to state whether another expert replicating the water test

9   would "reach the same conclusions" that he reached. (*Id.* at 129:21-130:2.)

10  However, he "believe[d] the same phenomena is going to be there," but that another

11  expert "may use different words to describe it." (*Id.* at 130:2-5.)

12      **2.    Inspection Of Three Sleepers Selected By Plaintiffs' Counsel**. Dr.

13  Yang inspected three Sleepers selected by Plaintiffs' counsel, but did not know who

14  had used the Sleepers or under what conditions. (*See id.* at 85:22–86:18.) He

15  found mold on two Sleepers, but could not confirm the presence of mold on the

16  third. (*See id.* at 86:19–88:9.) He did not confirm which species of mold was

17  present on either Sleeper. (*See id.* at 172:17-21, 185:20-22.)

18      **3.    Unverified Consumer Reports Of Mold On Less Than One**

19  **Percent Of Sleepers Sold**. Dr. Yang relied in part on the number of consumer

20  reports of mold on Sleepers, but he admitted that none of these reports had been

21  verified and, thus, that all of them may have been inaccurate. (*See id.* at 81:6–

22  85:17.) Dr. Yang does not know the number of Sleepers that actually developed

23  mold. (*See id.* at 99:9-17.)

24      Dr. Yang also recognized that the number of unverified consumer reports

25  between September 2009 and December 13, 2011 was "131," but that "800,000"

26  Sleepers were sold in that period. (*See id.* at 97:8-22.) Even as he attempted to

27  inflate the number of unverified consumer reports to "several hundred and probably

28  over 1,000 or more," Dr. Yang conceded that the "percentage number" of such

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1  reports "is very low," and tops out at less than one percent of the total number of

2  Sleepers sold.  (*Id.* at 99:2–100:20.)

3      **4.**    **FP Study Under Unknown Conditions**.  Dr. Yang also referred to an

4  internal FP study that suggested that, "under the right condition[s]," mold growth

5  on the Sleeper "will become visible to the naked eyes . . . in a matter of three or

6  four days."  (*Id.* at 89:18-23.)  Dr. Yang did not know the "conditions" under which

7  the FP study was conducted, or whether the study was conducted "in a laboratory

8  condition," in "someone's warehouse," or elsewhere.  (*Id.* at 123:12-14.)  Dr. Yang

9  therefore "cannot tell" whether those conditions replicate "actual use" of the

10 Sleeper.  (*Id.* at 105:4-6.)

11     **5.**    **Bureau Veritas Study Under Unknown Conditions**.  Dr. Yang also

12 relied on a study of the Sleeper commissioned by FP and carried out by Bureau

13 Veritas, an independent laboratory.  (*See* Ex. A [Yang Decl.] ¶ 26; Ex. B [Yang

14 Dep.] at 71:21–74:9.)  The Bureau Veritas study suggested that six genera of

15 "common household molds" could grow on the Sleeper under certain conditions.

16 (Ex. B [Yang Dep.] at 71:21–74:9.)  Even though each genus of mold might have

17 "hundreds" of "different" species, the Bureau Vertias study did not identify any

18 particular species that might grow on the Sleeper.  (*See id.* at 71:21–74:9, 187:6-

19 11.)  Dr. Yang also has "no information" regarding the conditions of the Bureau

20 Veritas test, such as how the test Sleepers were stored, used, or maintained; how

21 frequently they were cleaned; or how any of them "came to be sufficiently wet to

22 permit mold to grow."  (*Id.* at 66:23–67:10.)

23     **6.**    **Medical Case Studies Involving Mold Species Not Found On Any**

24 **Sleeper And Immunocompromised Individuals**.  Dr. Yang bases his opinion of a

25 "significant risk" of health effects on medical case studies suggesting that exposure

26 to particular species of mold contributed to certain diseases in a few

27 immunocompromised individuals.  *See, e.g.,* Ex. A [Yang Decl.] ¶¶ 28–42.)  But

28

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

Dr. Yang made the following concessions that eviscerate his reliance on the case studies:

- ***Dr. Yang does not know the particular species of mold found on any Sleeper***:  Dr. Yang can identify only the *genera* of mold found on the Sleeper in the Bureau Veritas study, but cannot identify any *species* of mold that has been or could be found on a Sleeper.  (*See* Ex. B [Yang Dep.] at 172:1-21, 185:20-22, 217:4-24.)  He therefore cannot testify that any Sleeper will expose any person to any particular species of mold, or that any Sleeper places any person at risk of any of the diseases he identified in his report.  (*See id.*)

- ***The case studies involved rare diseases***:  Dr. Yang admitted that the case studies involved only "an individual case or a few cases" of mold-related diseases that are "not widespread" or common.  (*Id. at* 190:14-23; *see also id.* at 189:9-14 (admitting that study involved 3 cases); *id.* at 197:13-17 (admitting that study involved 1 case); *id.* at 201:17–203:19 (admitting that study involved 201 cases over 75 years); *id.* at 205:13-16 (admitting that he did not "know the incidence" of certain "human health disorders" identified in his report); *id.* at 208:2-5 (admitting that study involved 2 cases); *id.* at 216:14-25 (conceding that study involved "seven cases . . . reported worldwide as of about 1999" and that the condition is "very rare"); *id.* at 229:23–230:2 (study of one case); *id.* at 241:4-8 (study of one case).)

- ***The case studies involved immunocompromised individuals***:  Dr. Yang acknowledged that the case studies involved immunocompromised individuals, who are "susceptible to infections."  (*Id.* at 173:15-17.)  Those individuals had "underlying" conditions such as "leukemia," "penetrating injury," AIDS, "Cushing's syndrome," "cystic fibrosis" (*id.* at 190:11, 191:21-22, 200:17, 202:14-15, 214:15), or had received such treatments as "chemotherapy," "bone-marrow transplants," "solid organ transplants," or "lung transplant[s]" (*id.* at

190:12, 200:18, 202:14, 214:15-16).  Dr. Yang does not know whether any member of the putative class is immunocompromised.  (*See id.* at 191:12-14, 215:2–216:5.)

• **Dr. Yang has no information about immune-competent individuals or infants**:  Dr. Yang did not cite any studies associating mold-related diseases with immune-competent individuals of any age, including infants younger than six months old, the expected age range for using the Sleeper.  (*See id.* at 195:1-13, 204:3-6, 206:21-24, 209:4-24, 241:19-24.)

• **Dr. Yang has no support for certain causation opinions**:  Dr. Yang opined in his declaration that certain species of mold could "cause" certain diseases, but admitted at his deposition that he had no support for a causal link with respect to at least three of those diseases.  (*Compare, e.g.*, Ex. A [Yang Decl.] ¶ 28 (stating that Alternaria may "cause hay fever or hypersensitivity reactions that sometimes lead to asthma"), *with* Ex. B [Yang Dep.] at 199:14-16 (stating that he needed to "double check" his authority for that assertion); Ex. A [Yang Decl.] ¶ 28 ("Many human health disorders can be caused by these fungi."), *with* Ex. B [Yang Dep.] at 204:7-22 ("I need to double check on that… reference source."); Ex. A [Yang Decl.] ¶ 28 ("Alternaria colonizes the paranasal sinuses, leading to chronic hypertrophic sinusitis."), *with* Ex. B [Yang Dep.] at 208:11-15 (conceding that the study "did not find that the fungus was causal").)

• **Dr. Yang based at least one causation opinion on studies disclaiming a causal connection**:  Dr. Yang stated in his declaration that at least one study demonstrated a "causal" link between a species of mold and a disease when, in fact, that study and the studies it referenced *disclaimed* a causation conclusion in favor of an "association" conclusion.  (*Compare* Ex. A [Yang Decl.] ¶ 38, *with* Ex. B [Yang Dep.] at 233:6–240:20.)

**7.** **Unanalyzed Possibility Of Transfer Of Mold From Household Sponges Through Bleach Solution During Cleaning**.  Dr. Yang initially stated his uncertainty as to whether the CPSC-approved cleaning instructions directed use

1   of a sufficiently concentrated bleach solution and sufficient exposure time to kill

2   mold, but then conceded that they do.  (*See* Ex. B [Yang Dep.] at 256:1-18.)  Thus,

3   his opinion regarding the "inadequa[cy]" of the instructions boils down to the

4   possibility that household sponges might "harbor bacteria or mold" and, thus,

5   "introduce additional mold or bacteria" to the Sleeper during cleaning.  (*Id.* at

6   246:11-16.)  Dr. Yang, however, did not "do any analysis of the risk to consumers

7   of mold or bacterial infections from their use of sponges," and was not aware of any

8   report that a consumer "developed mold or bacteria on his or her [S]leeper as a

9   result of cleaning the [S]leeper with a sponge."  (*Id.* at 247:8–248:9.)  Dr. Yang also

10  did not explain how a sponge exposed to a bleach solution he deemed sufficient to

11  *kill* mold could somehow *transfer* mold to a Sleeper during cleaning.  (*See id.* at

12  256:1-23.)

13  **III.   LEGAL STANDARD**

14          A district court may consider expert evidence "presented in support of or in

15  opposition to a motion for class certification" only where it passes a full *Daubert*

16  analysis under Rule 702.  *Cholakyan*, 281 F.R.D. at 541; *see also Ellis*, 657 F.3d at

17  982 (noting that, class certification stage, the trial court "must exclude junk science

18  that does not meet Federal Rule of Evidence 702's reliability standards").  Under

19  Rule 702, "[a] witness who is qualified as an expert by knowledge, skill,

20  experience, training, or education may testify in the form of an opinion or

21  otherwise" if:

22          (a) the expert's scientific, technical, or other specialized knowledge
            will help the trier of fact to understand the evidence or to determine a
23          fact in issue;
24

25          (b) the testimony is based on sufficient facts or data;

26          (c) the testimony is the product of reliable principles and methods; and
27

28

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1
2
(d) the expert has reliably applied the principles and methods to the facts of the case.

3
4
5
Fed. R. Evid. 702. At all times, the proponents of the expert testimony—here, Plaintiffs—bear the burden to prove admissibility under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) ("*Daubert I*").

6
7
8
9
10
11
12
13
14
15
16
17
This Court's crucial "gatekeeping role," *id.* at 597; *Estate of Barabin v. AstenJohnson, Inc.*, No. 10-36142, 2014 U.S. App. LEXIS 774, at *12 (9th Cir. Jan. 15, 2014) (en banc), requires at the outset a determination of whether the witness possesses the "requisite knowledge, skill, experience, training, or education" to qualify as an expert under Rule 702 as relevant to the fact at issue. *United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000); *see also Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 833 (C.D. Cal. 2010) ("the court must examine whether the witness's qualifying training, experience, or specialized knowledge is sufficiently related to the subject matter upon which the witness offers an opinion"). Only if the putative expert satisfies that requirement does the Court proceed to consider whether the proffered testimony is both "reliable" and "relevant." *See Estate of Barabin*, 2014 U.S. App. LEXIS 774, *14–15.

18
19
20
21
22
23
24
25
26
27
The reliability requirement examines whether the testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). In other words, the expert's testimony must reflect "scientific knowledge," be "derived by the scientific method," and reflect "good science." *Daubert I*, 509 U.S. at 590, 594–95; *see also Estate of Barabin*, 2014 U.S. App. LEXIS 774, *12–13. The focus of this requirement is "solely on principles and methodology, not on the conclusions that they generate." *Daubert I*, 509 U.S. at 595. The relevance or "fit" requirement allows admission only of expert testimony that "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*,

28

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1   43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*").  "Federal judges must therefore

2   exclude proffered scientific evidence . . . unless they are convinced that it speaks

3   clearly and directly to an issue in dispute in the case, and that it will not mislead the

4   jury." *Id.* at 1321 n.17.

5   IV.   **ARGUMENT**

6       Dr. Yang concededly lacks the requisite expertise, did not use a reliable

7   methodology, and offers no opinions that speak to the issues presented in Plaintiffs'

8   Motion for Class Certification or this case.  The Court should strike Dr. Yang's

9   declaration.

10       A.    **BY HIS OWN ADMISSION, DR. YANG LACKS THE REQUISITE EXPERTISE TO OFFER HIS OPINIONS**

11   

12       A federal court may admit proffered expert testimony only where the witness

13   has "knowledge, skill, experience, training, or education relevant to [the] evidence

14   or [a] fact in issue." *Chang*, 207 F.3d at 1172.  Courts in this circuit have

15   vigorously applied this requirement to exclude testimony from even a recognized

16   expert that strayed outside the scope of the witness's expertise.  *See, e.g.*, *id.* at

17   1172–73 (a "well-qualified" expert in international finance could not testify

18   regarding whether securities were counterfeit because he had "no experience" in

19   identifying counterfeit securities); *Gable*, 727 F. Supp. 2d at 835 (author of treatise

20   on copyright law could not testify on whether one work of literature infringed the

21   copyright of another because he was not "a literary expert").

22       Here, Dr. Yang has admitted that he is "not an engineer," is not qualified to

23   offer expert testimony regarding the Sleeper's "design," is not a "medical

24   causation" expert, and is not a "risk assessor."  (Ex. B [Yang Dep.] at 50:24–55:4,

25   247:13-14.)  He therefore lacks the qualifications to opine that, due to its "*design*,"

26   the Sleeper has a "high propensity to develop fungal/mold growth" and *causes* an

27   "unnecessary *risk*" of adverse health effects.  (Ex. A [Yang Decl.] ¶¶ 55-

28   56 (emphases added).)  Dr. Yang also is concededly not an expert in "industrial

hygiene," and thus cannot opine regarding the alleged "inadequacy" of the CPSC-approved cleaning instructions.  (Ex. B [Yang Dep.] at 53:7-8.)  For this reason alone, his declaration should be stricken.  *See, e.g.*, *Chang*, 207 F. 3d at 1172-73; *Daubert II*, 43 F.3d at 1315; *Gable*, 727 F. Supp. 2d at 835.

Dr. Yang's training and experience as a microbiologist and mycologist are wholly insufficient to fill this void.  In the first place, nothing in this training and experience qualifies him to opine on the Sleeper's "design" or "industrial hygiene"—as Dr. Yang *concedes*.  (*See* Ex. B [Yang Dep.] at 50:24–55:4.)  Moreover, Dr. Yang's attempt to opine that the Sleeper poses "a significant risk" of mold-related disease fails on his concession that he lacks expertise to connect the "general health effect" of mold to "specific individuals or . . . a small group of individuals."  (*Id.* at 51:7-10.)  And, of course, as Dr. Yang disclosed, at least one other court has refused to permit him to testify on even the "general health effect" of mold.  (*Id.* at 42:1-12, 51:10-16. ) Dr. Yang is not qualified to offer his opinions in support of class certification or otherwise.

**B.    DR. YANG DID NOT APPLY A RELIABLE SCIENTIFIC METHOD AND CANNOT CLOSE THE ANALYTICAL GAP BETWEEN HIS DATA AND HIS OPINION**

Even if Dr. Yang's declaration could survive his conceded lack of expertise, it still should be stricken because he failed to apply a reliable method and cannot close the vast analytical gap between his data and his opinion.

**1.    Dr. Yang Has Pointed To No Objective, Verifiable Evidence That He Applied A Reliable Method**

The requirement that a putative expert's methodology be reliable applies with particular force where, as here, the expert has "developed [his] opinions expressly for purposes of testifying" rather than "naturally and directly out of research . . . conducted independent of the litigation."  *Daubert II*, 43 F.3d at 1317.  "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the

testimony is based on scientifically valid principles." *Id.* at 1317–18.  In other words, "the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.  A failure to satisfy this burden requires exclusion of the expert's testimony.  *See id.*; *see also Domingo v. T.K.*, 289 F.3d 600, 605–06 (9th Cir. 2002).

Dr. Yang performed his analysis and developed his opinions solely for this case, and not "naturally and directly out of research . . . conducted independent of the litigation." *Daubert II*, 43 F.3d at 1317.  Yet Dr. Yang has not "explain[ed] precisely" his methodology or pointed to "objective, verifiable evidence that the testimony is based on scientifically valid principles." *Id.* at 1317–19.  He has identified no treatises, academic articles, or other publications demonstrating that he has "followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." *Id.* at 1319.  For this reason alone, his declaration should be stricken.  *See id.*; *see also Domingo*, 289 F.3d at 605–06.

> **2.    Dr. Yang Admitted That He Did Not Develop A Hypothesis And That There Are No Standards To Support His Subjective Opinions**

Scientific methodology is "based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert I*, 509 U.S. at 593.  Courts may consider a number of factors in determining whether the expert's method is reliable, including whether the method "can be (and has been) tested," whether it has been "subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operation," and "general acceptance" in the relevant field. *Id.* at 593–94; *see also*

1  *Estate of Barabin*, 2014 U.S. App. LEXIS 774, *12-13; *Daubert II*, 43 F.3d at

2  1318–20.  A federal court should not accept "the *ipse dixit* of the expert" that a

3  methodology is reliable.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

4       Here, Dr. Yang's failure to point to objective, external evidence that his

5  method was reliable is unsurprising because he has conceded away the reliability of

6  his method.  Dr. Yang admitted that he did not even "think about" developing or

7  testing "a hypothesis" regarding the Sleeper, (*see* Ex. B [Yang Dep.] at 101:15–

8  103:3), even though testing a hypothesis is the very essence of the scientific

9  method, *see Daubert I*, 509 U.S. at 595.  Dr. Yang further admitted that there are *no*

10  standards or "standardized testing conditions" to support his "subjective" opinions

11  in this case.  (Ex. B [Yang Dep.] at 94:15-22, 101:3-6.)

12       Indeed, Dr. Yang's invented concept of a "high propensity to develop mold"

13  is "not a technical term" of recognized meaning and does not have any

14  "standardized" test.  (*Id.* at 94:15-24.)  Dr. Yang offered only his own "belief" to

15  distinguish between a "high, medium, and low" propensity to develop mold, and

16  had not even considered the proportion of Sleepers that reportedly develop mold,

17  even though he viewed that proportion as integral to proving a "high propensity" to

18  develop mold.  (*Id.* at 80:2–82:22.)  Dr. Yang's standardless belief, of course, has

19  not been subjected to peer review or publication. it has an unknown error rate, and

20  it has not achieved "general acceptance" in the field.  (*Id.* at 94:8-24.)  *See also*

21  *Daubert I*, 509 U.S. at 593–94.

22       Dr. Yang's self-created, qualitative water test typifies his standardless,

23  unverified approach in arriving at his "high propensity" opinion.  The water test

24  involved an unspecified volume of water, an indeterminate amount of time, and no

25  measurement of the rate of humidity in the room, even though Dr. Yang knew that

26  "how quickly [the Sleepers] dry is going to be subject[] to the ambient humidity."

27  (Ex. B [Yang Dep.] at 130:20–133:18.)  Dr. Yang also "did not" quantify or

28  measure the degree to which the Sleeper "traps moisture," even though he knows of

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1   "a way" to do so.  (*Id.* at 135:24-136:13.)  Instead, Dr. Yang merely observed the

2   Sleepers and touched them with his finger.  (*Id.* at 128:4-21.)  And Dr. Yang used

3   "ordinary English usage"—"at least how [he] use[s] it"—to relay his observations,

4   conceding that another expert might "use different words to describe" the results of

5   the water test, if it could ever be replicated.  (*Id.* at 130:1-11.)

6        Nor did Dr. Yang articulate an objective standard for measuring a

7   "significant risk" of mold-related health effects in infants, parents or siblings.  (*See*

8   *id.* at 217:4-14.)  Instead, he found such a "significant risk" if a species of mold

9   *never* shown to have been present in any Sleeper contributed to even a single

10  immunocompromised individual contracting a disease that he "would not want

11  anybody to have."  (*Id.* at 217:4-20.)

12       Nor, finally, did Dr. Yang perform any "study," "assessment," or data

13  collection regarding the adequacy of the CPSC-approved cleaning instructions.  (*Id.*

14  at 257:17–259:12.)  He therefore relied on the possibility that household sponges

15  may have mold or bacteria that could be transferred to a Sleeper during cleaning.

16  (*See id.* at 246:12–248:14.)  But Dr. Yang never even analyzed that possibility—

17  much less did so according to replicable, peer-reviewed, generally accepted

18  standards—and he did not explain how mold in a household sponge could survive

19  exposure to a bleach solution he believed was adequate to kill mold.  (*See id.* at

20  246:11–256:18.)

21       Dr. Yang's reliance on standardless, subjective methodologies to find a "high

22  propensity" to develop mold, a "significant risk" of health effects, and the CPSC-

23  approved cleaning instructions "inadequate" defeats Plaintiffs' attempt to admit his

24  testimony.  *See Gen. Elec.*, 522 U.S. at 146.

25       **3.    Dr. Yang Cannot Close The Analytical Gap Between His
             Data And His Opinion**

26

27       A federal court also must exclude putative expert testimony under Rule 702

28  where "there is simply too great an analytical gap between the data and the opinion

1   proffered." *Gen. Elec.*, 522 U.S. at 146; *Domingo*, 289 F.3d at 607.  The expert

2   must provide "support for every necessary link" in the opinion.  *Domingo*, 289 F.3d

3   at 606.  Thus, where an expert relies on studies to support an opinion, the studies

4   must involve situations "similar" to the case, and the expert "must set forth the

5   steps used to reach the conclusion that the research is applicable." *Id.*

6        The analytical gap between the data on which Dr. Yang relies and his

7   subjective opinion "is simply too great" to permit admission of his testimony.  *Gen.*

8   *Elec.*, 522 U.S. at 146; *Domingo*, 289 F.3d at 606.  *First*, even if it were reliable,

9   Dr. Yang's self-created, "qualitative" water test did not produce any mold growth

10  and demonstrates only that water might be retained in the Sleeper under certain

11  conditions.  (*See* Ex. B [Yang Dep.] at 64:4–68:19, 130:20–133:18.) It therefore

12  does not show that the Sleeper has any propensity, "high" or otherwise, to develop

13  mold under conditions of "actual use."  (*Id.*)

14       *Second*, Dr. Yang's inspection of the three Sleepers selected by Plaintiffs'

15  counsel confirms only that two Sleepers developed mold under unknown

16  conditions, and thus also does not demonstrate any propensity to develop mold

17  under conditions of actual use.  (*See id.* at 85:14–86:18.)

18       *Third*, as Dr. Yang recognized, the unverified consumer reports of mold may

19  have been inaccurate, and he does not know how many Sleepers actually did

20  develop mold.  (*See id.* at 99:9-24.)  Moreover, the number of unverified reports is

21  miniscule—less than one percent—in comparison to the total number of Sleepers

22  sold.  (*See id.*)

23       *Fourth*, the fact that the FP and Bureau Veritas studies demonstrated that

24  mold could grow on the Sleeper again fails to support Dr. Yang's ultimate opinion

25  of a "high propensity" to develop mold because Dr. Yang does not know the

26  conditions under which those studies were conducted, and thus "cannot tell you"

27  whether those conditions replicate "actual use."  (*Id.* at 66:3–67:21, 105:4-6, 123:7-

28  14.)

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

1  *Fifth*, the *only* evidence upon which Dr. Yang relies for his opinion of a

2  "significant risk" of mold-related health effects are case studies involving at most

3  "a few cases" of diseases associated with particular species of mold.  (*Id.* at 190:14-

4  23.)  But Dr. Yang can identify only the *genera*, but *not* the *species*, of mold that

5  have ever been found on a Sleeper. (*See id.* at 71:21–74:9, 172:16-21, 185:20-22,

6  187:2-25, 217:4-24.)  He thus cannot testify that any Sleeper would even *expose*

7  any individual to any particular mold species, much less place anyone at *any* risk,

8  let alone a "significant risk," of developing any of the diseases he identifies.  (*See,*

9  *e.g.*, *id.*)

10      The chasm between the case studies and Dr. Yang's opinion of a "significant

11  risk" of health effects does not end there.  The case studies involved

12  immunocompromised individuals who suffered from such conditions as leukemia,

13  cystic fibrosis, and AIDS, or who had received such treatments as chemotherapy

14  and bone-marrow transplants.  (*See id.* at 190:11-12, 200:17-18, 202:12, 214:15-16,

15  241:19-24.)  Dr. Yang did not know whether any member of the putative class is

16  immunocompromised, and did not have any information about immune-competent

17  individuals of any age, including infants within the expected age range for using the

18  Sleeper. (*See id.* at 195:8-13, 204:3-6, 206:21-24, 209:4-24, 241:19-24. )

19      Moreover, the case studies did not support—and, in at least one instance,

20  *contradicted*—Dr. Yang's testimony of a causal link between a particular species of

21  mold and a disease.  (*Compare, e.g.*, Ex. A [Yang Decl.] ¶¶ 28, 30, *with* Ex. B

22  [Yang Dep.] at 199:4-10, 204:7-15, 208:11-15, 233:3–241:24.)  And Dr. Yang did

23  not conduct any "risk assessment" or reference a study regarding the purported

24  health risks to parents and siblings of infants who used the Sleeper.  (Ex. B [Yang

25  Dep.] at 244:3-10.)

26      *Finally*, Dr. Yang offered *no* data or information to support his opinion that

27  the CPSC-approved cleaning instructions are inadequate, relying instead on the

28  unanalyzed possibility that household sponges in contact with a bleach solution

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG

could somehow transfer mold to a Sleeper during cleaning.  (*See id.* at 246:11–263:23.)

Dr. Yang's data therefore do not involve situations "similar" to this case or provide "support for every necessary link" in his opinions.  *Domingo*, 289 F.3d at 606.  The Court should strike his declaration.

## C.   DR. YANG'S SUBJECTIVE OPINIONS DO NOT FIT PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OR THIS CASE

Finally, given Dr. Yang's lack of expertise, the unreliability of his methodology, and the quantum leap between his data and opinion, it is unsurprising that Dr. Yang's opinion does not "fit" any issue presented here.  *Daubert II*, 43 F.3d at 1315.  In fact, nothing in Dr. Yang's declaration or testimony would "logically advance[] a material aspect" of Plaintiffs' Motion for Class Certification or their case.  *Id.*  Because Dr. Yang's declaration fails to provide *admissible* proof of Plaintiffs' allegations regarding the Sleeper and the CPSC-approved cleaning instructions, it cannot provide the *common* proof regarding those issues that Plaintiffs need.  (*See* Pls.' Memo. at 13.)  *See also Comcast*, 133 S. Ct. at 1432.

As a result, Dr. Yang's subjective testimony would not help the fact finder but might "mislead the jury" into thinking that that the Sleeper has a "high propensity" to develop mold based on (i) the "water test," which did not show *any* mold growth on a Sleeper; (ii) Dr. Yang's inspection of three Sleepers selected by Plaintiffs' counsel; (iii) unverified consumer reports implicating *less than one percent* of Sleepers sold; and (iv) the FP and Bureau Veritas studies, which were conducted under unknown conditions.  *See Daubert II*, 43 F.3d at 1315; (Ex. A [Yang Decl.] ¶ 55).  Dr. Yang's testimony might also mislead the jury into concluding that case studies of a few immunocompromised individuals developing illnesses associated with species of mold *not* found in any Sleeper establish a "significant risk" of health effects from the Sleeper.  *See Daubert II*, 43 F.3d at

1315; (Ex. A [Yang Decl.] ¶ 55. ) And it could mislead the jury into thinking that the unanalyzed possibility that household sponges might transfer mold to a Sleeper during cleaning supports a finding that the CPSC-approved instructions are "inadequate."  (Ex. A [Yang Decl.] ¶ 52.)  Dr. Yang's testimony is harmful rather than helpful and should be excluded.  *See Daubert II*, 43 F.3d at 1315, 1321 n.17.

## V.     CONCLUSION

For all of the foregoing reasons, the Court should strike the declaration of Plaintiffs' putative expert Chin S. Yang offered in support of Plaintiffs' Motion for Class Certification.


Dated:  February 18, 2014                    JONES DAY


By:_____/S/_____
              Hugh R. Whiting

Attorneys for Defendants
MATTEL, INC. AND FISHER-
PRICE, INC.

DEFENDANTS' MOTION TO STRIKE
PLAINTIFFS' EXPERT CHIN YANG